UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

FILED

2012 MAR -2  P 3: 58

U.S. DISTRICT COURT
BRIDGEPORT, CONN

| | | |
|---|---|---|
| JASON ISENBERG, | : | Case No.: |
| Plaintiff | : | |
| VS. | : | **COMPLAINT**  3:12CV 314 (JCH) |
| UNIVERSITY OF CONNECTICUT AND DAVID KAPLAN, | : | |
| Defendant | : | MARCH 2, 2012 |

### INTRODUCTION

1. This lawsuit challenges the University of Connecticut's ("UCONN") and David Kaplan's retaliation against Jason Isenberg because he took a medical leave of absence under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. 2601a et seq. and for not paying overtime wages in violation of the Fair Labor Standards Act of 1938, ("FLSA"), 29 U.S.C. §201 et seq. and Connecticut's Minimum Wage Act ("CMWA"), Conn. Gen. Stat. §31-58 et seq.

### JURISDICTION

2. This is an action for relief brought under the FMLA, FLSA and CMWA.

3. This court has jurisdiction under 28 U.S.C. §1331, 29 U.S.C. § 2601 et seq. and pendant jurisdiction over his state law claims.

### VENUE

4. Pursuant to 28 U.S.C. §1391(b), venue is proper in this District because the Defendants and Plaintiff each reside in this District and the events which led to this Complaint occurred in this District.

## PARTIES

5.  Jason Isenberg (Mr. Isenberg or the plaintiff) is a resident of New York State. At all relevant times, Mr. Isenberg was employed in the University of Connecticut's Athletic Department in their Video Services Department. He became an employee of UCONN in 1995. He was a member of The University of Connecticut Professional Employees Association Local 3b95 AFTCT, AFT, AFL-CIO. He was an "employee" under the FMLA and "non-exempt" employee under the FLSA and the CMWA.

6.  Defendant, University of Connecticut ("UCONN") is located in Storrs, Connecticut. It is an educational institution and is an "employer", as the term is defined under the FMLA and the CMWA, and an "enterprise" under the FLSA.

7.  Defendant, David Kaplan, is the Director of Video Services for the University of Connecticut's Athletic Department. Mr. Kaplan is an "employer", as the term is defined under the FMLA.

## FACTS

8.  Mr. Isenberg started working at UCONN's Video Services Department in 1991 while he was a student at UCONN. He became an employee of the Video Services Department in 1995. Mr. Isenberg's performance during the two decades he has worked at UCONN has consistently been praised. For example, his overall annual performance evaluation during the time period from May 1, 2006 through April 30, 2010 were as follows:

| Time Period | Evaluation |
| --- | --- |
| 5/1/06-4/30/07 | Very Good |

| | |
|---|---|
| 5/1/07-4/30/08 | Outstanding |
| 5/1/08-4/30/09 | Very Good |
| 5/1/09-4/30/10 | Outstanding |

9. Mr. Isenberg's annual evaluations during the four year time period were completed by Mr. Kaplan. Mr. Isenberg received a rating of "Outstanding" or "Very Good" in each rating category. In the categories of "Communication" and "Interpersonal", Mr. Kaplan's comments about Mr. Isenberg during that four year period for 2006-2010 included the following:

> Jason is extremely accessible and approachable to all coaches and members of the Division of Athletics. He has established solid working relationships not only with the athletes, but also throughout the campus community.
>
> Jason communicates clearly with all members of the Department Of Athletics.
> Jason does a tremendous job communicating with coaches.
>
> Jason does an excellent job communicating the technical aspect of video so that coaches understand and can plan accordingly.
>
> He has established excellent working relationships not only within the Department of Athletics but also through the entire University population.

10. On February 26, 2011, Mr. Isenberg injured his knee. Mr. Isenberg called Mr. Kaplan as soon as he left the hospital emergency room the following day and left him a voice mail message about the injury. Mr. Isenberg went to work on Monday, February 28, 2011 while in significant pain and on crutches. The trainer in UCONN's athletic department with whom he spoke recommended that he make an appointment with Dr. Arciero to schedule an MRI. Mr. Isenberg took the first available appointment and the MRI was done on Thursday, March 8, 2011. At Mr.

Isenberg's request, the appointment was scheduled for 6:30 a.m. so that Mr. Isenberg would not miss any work.

11.   Dr. Arciero reviewed the MRI March 14, 2011 with Jason and told him that, on a scale of 1-10, his injury was an 8, was one of the worst he had seen and he would not be able to do the surgery arthroscopically.  Dr. Arciero added that there was a bone fragment along with the injury and that would require full surgery to repair the injury.  Dr. Arciero told Jason he wanted to get him in for surgery as soon as possible and asked his assistant to schedule the surgery for April 8, 2011.  (Because Dr. Arciero was traveling and this was the first time he would be available.)  Dr. Arciero's assistant said she would contact him the following day with the proposed surgery date.

12.   The following morning Mr. Isenberg told Mr. Kaplan that the injury was more serious than expected and that Dr. Arciero wanted him to do the surgery as soon as possible and would probably schedule it in the next few weeks.

13.   Mr. Isenberg was then called by Dr. Arciero's assistant and she told him that April 8th was not available but they wanted to do the surgery on the next available date of April 12, 2011.  Mr. Isenberg then went to Keith Anderson's office at Gampel Pavilion, where several employees in the Video Department asked Mr. Isenberg questions about the surgery.  Mr. Isenberg explained that he had just received a call from Dr. Arciero's office and his assistant told him the surgery would be April 12, 2011.  Mr. Kaplan, who was also in the office at the time, did not say anything in response.

14.   On March 19, 2011, Mr. Kaplan called Mr. Isenberg to see how football practices were going.  Mr. Kaplan said that Will Brown, who also worked in the Video Services Department, was leaving for a job at the University of Maryland and that he would need to find a way to

cover the video responsibilities related to Spring football. Mr. Isenberg said that he would help out as much as he could be reminded him that his surgery was scheduled for April 12, 2011.

15. The following morning, March 20, 2011 Mr. Isenberg was working at Gampel Pavilion before a women's basketball NCAA tournament game. At about 10:00 a.m. Mr. Kaplan confronted Mr. Isenberg and told him that he needed to reschedule his surgery because Mr. Isenberg had not asked him and cleared April 12th with him first. Mr. Isenberg responded that his doctor wanted to do the procedure as soon as possible. Mr. Kaplan responded "If you don't move your surgery I will do everything in my power to get you fired."

16. Mr. Isenberg did contact his doctor's office and was told that they highly recommended against changing the surgery date.

17. On March 23, 2011 Mr. Isenberg wrote a memo to the Senior Associate Director of Athletics / Internal Operations, Dino Mattessich, to let him know how Mr. Kaplan was retaliating against him for seeking necessary knee surgery. Mr. Isenberg added that if Mr. Kaplan persisted with his threat to have Mr. Isenberg fired or if his job changed in any material way, he would proceed with legal action.

18. On March 23, 2011—three days after Mr. Kaplan threatened to do everything in his power to get him fired—Mr. Kaplan changed the plaintiff's hours from 8:30 a.m. – 5:00 p.m. on Monday –Friday, to Monday – Saturday, 7:30 a.m. – 9 p.m. on football practice days and 7:30 a.m. – 7:15 p.m. on days when there was no football practice.

19. In response to the letter Mr. Mattessich said the it was "serious" and he would need to discuss it with the Senior Associate Director of Athletics, Paul McCarthy. On the day before his knee surgery, Mr. Isenberg met with Mr. Mattessich and Mr. McCarthy. They assured Mr. Isenberg that he would not be retaliated against for taking medical leave.

20. Mr. Isenberg had the knee surgery on April 12, 2011. After the surgery he started physical therapy treatment three times a week, as prescribed by Dr. Arciero.

21. Mr. Kaplan retaliated against Mr. Isenberg. For example, on May 4, 2011, Mr. Kaplan provided Mr. Isenberg with the worst performance evaluation he ever received in his career. In two rating categories where Mr. Kaplan reviewed his performance—Communication and Interpersonal—Mr. Kaplan rated him as "In Need of Improvement". Mr. Kaplan said that "Jason needs to more effectively communicate with myself and other colleagues within the Division. Jason needs to improve his relationship with the programs he's responsible for and needs to communicate any concerns they have to the Director as soon as they occur." In the category of Interpersonal Skills Mr. Kaplan elaborated that Jason"…needs to work on building and maintaining relationships with coaches involved in the teams he's responsible for.". In addition, Mr. Isenberg was downgraded in the category of "Team Work" even though, prior to his surgery, he handled all of his job responsibilities as well as the responsibilities related to videotaping football that had previously been performed by Will Brown, who had resigned on March 26, 2011. During this time period, Mr. Isenberg worked 12-14 hours per day for several weeks.

22. In the four years leading up to the May 4 review, Mr. Isenberg received a rating of "outstanding" and "very good" in every rating category. However in this review, he failed to rate Mr. Isenberg as being "outstanding " or "very good" in any of the nine categories rated.

23. Mr. Isenberg was stunned when Mr. Kaplan provided him with the written performance review. When Mr. Isenberg asked him to explain why he gave him such low marks, Mr. Kaplan gave him a couple of examples but said he did not want to get into specifics. Mr. Kaplan further stated that there were things that they could discuss at a later time but he was late for a meeting and he needed Mr. Isenberg to sign the performance letter and take it with him.

24. In March 2011, Mr. Isenberg made plans to take off June 27th and 28th to attend to his wedding plans. Article 6.1(e) of the Collective Bargaining Agreement ("CBA") between The University of Connecticut Board of Trustees and The University of Connecticut, Professional Employees Association Local 3695, AFTCT, AFL, AFL-CIO ("CBA") in effect at that time and that governs Mr. Isenberg's employment provides, in relevant part, that employees may take up to 3 vacation days per calendar year without requesting them in advance from their Dean, Director or Department Head. Article 9 of the CBA also provides that an employee is entitled to take 2 days per year for personal business. However, in early April, Mr. Kaplan told him that he could not allow him to use those two days "until we have a new football person in place." On June 16th, Jason Sanders started working in the vacant football video position. Nevertheless, on or around June 20, 2011, Mr. Kaplan said that Mr. Isenberg still needed to work on Monday, June 27th because Jason Sanders (1) is looking for a place to live, (2) needs to purchase a car and (3) "is still learning the way we do things."

25. In contrast to Mr. Kaplan's willingness to accommodate Mr. Sanders' work schedule while he looked for a house and a car, Mr. Kaplan has continuously harassed Mr. Isenberg because of his physical therapy visits even though Jason scheduled these before the normal start of the day at 9:30 a.m. Mr. Kaplan changed Mr. Isenberg's hours to make it impossible for him to schedule physical therapy visits.

26. Mr. Kaplan has made disparaging comments to Mr. Isenberg when witnesses were not around. For example, Mr. Kaplan told Mr. Isenberg that Mr. Anderson, and not Mr. Isenberg, was now in charge when he (Mr. Kaplan) was not around because Mr. Anderson had surpassed Mr. Isenberg in his knowledge base. Mr. Kaplan sarcastically told him "You just keep on doing what you're doing. I love it. Keep creating a paper trail with your emails. This is going to be

fun." Soon after he moved up Mr. Isenberg's start time from 9:30 a.m. to 8:30 a.m. to interfere with his physical therapy appointments, he told Mr. Isenberg that, on August 1, 2011 he would need to start at 7:30 a.m.

27. Throughout his career at UCONN, Mr. Isenberg worked much more than he was required to do so. For example, he has approximately 76 accrued but unused vacation days, 11 holidays and over 1,700 hours of "comp time."

28. On June 23, 2011 the undersigned attorney sent a letter to Athletic Director (at that time) Jeffrey Hathaway and Senior Associate Director of Athletics (at that time) Paul McCarthy, summarizing the factual and legal basis for the plaintiff's FMLA claims and requested that the UCONN Athletic Department, in general, and Mr. Kaplan, in particular, stop retaliating against the plaintiff.

29. After the defendants received the aforesaid letter dated June 23, 2011, Mr. Kaplan continued to retaliate against Mr. Isenberg.

30. Mr. Kaplan repeatedly changed the plaintiff's work schedule so that he would have to work during the hours that he was scheduled to get physical therapy treatments for his surgically repaired knee.

31. Student interns are routinely assigned to employees in the Video Services Department to help them complete their assignments. In August, 2011, Mr. Kaplan assigned student interns to all employees in the department except the plaintiff.

32. As a result of the continued retaliation and interference with his physical therapy visits the plaintiff's attempt to rehabilitate his knee has been severely hampered.

33. As a result of the continued retaliation by Mr. Kaplan the plaintiff has suffered severe emotional distress.

34. As a result of his emotional trauma, the plaintiff requested and was granted FMLA leave effective September 1, 2011.

34. The plaintiff's knee injury in February, 2011 and surgery in April was a "serious illness" as the term is defined under the FMLA.

35. On October 7, 2011, the plaintiff submitted his resignation, effective October 21, 2011 and explained that he was resigning due to Kaplan's aforesaid behavior and retaliation.

36. The plaintiff was constructively discharged by the University of Connecticut on or about October 21, 2011.

37. On or about October 7, 2011, the plaintiff requested that the University of Connecticut pay him for his unused accrued compensatory time of 1,745.5 hours, which translated to $81,649.40.

38. The University of Connecticut refused to pay the plaintiff for his unused accrued compensatory time.

## FIRST COUNT – FMLA

39. Plaintiff repeats and realleges paragraphs 1-38 of the aforesaid complaint.

40. The plaintiff's knee injury in February, 2011 and surgery in April was a "serious illness" as the term is defined under the FMLA.

41. The defendants interfered with the plaintiff's FMLA rights.

42. The plaintiff believed, in good faith, that he was being retaliated against by Mr. Kaplan. That belief led him to complain to Mr. Kaplan, to write the memo discussed in the aforesaid paragraph 17, to meet with Mr. McCarthy and Mr. Mattessich on March 23rd and to have his attorney send the letter discussed in paragraph 28.

43. The defendants attempted to interfere with the plaintiff's FMLA rights.

44.     The defendants retaliated against the plaintiff for taking FMLA leave and for opposing what he believed to be discrimination under the FMLA.

45.     The defendants retaliated against the plaintiff for opposing the defendants' interference with his rights under the FMLA.

46.     As a result of the defendants' violation of the FMLA, the defendants are jointly and severally liable for loss of wages and benefits, compensatory damages, and attorney's fees and costs.

47.     The defendants willfully violated the FMLA and, therefore, the plaintiff is entitled to liquidated, or double, damages.

## SECOND COUNT - FLSA

48.     The plaintiff repeats and realleges paragraphs 1-38 of the aforesaid complaint.

49.     The CBA provides in Article 18.1 that "[c]ompensatory time for non-exempt employees shall be in accordance with the Fair Labor Standards Act."

50.     Section 207(o) of the FLSA provides that employees of a state agency may receive, in lieu of overtime compensation, compensatory time at a rate of not less than one and one-half hours for each hour of employment for which overtime compensation is required by this section.

51.     FLSA Section 207(o)(2)(A)(1) provides that a public agency may provide compensatory time under the provision of a CBA.

52.     FLSA Section 207(a)(3)(B) provides that "if compensation is paid to an employee for accrued compensatory time off, such compensation shall be paid at the regular rate earned by the employee at the time the employee receives such payment."

53.     FLSA Section 207(4) provides that an employee who has accrued compensatory time shall, upon termination, be paid for the unused compensatory time at a rate of compensation not less than

the average regular rate received by such employee during the last 3 years of the employee's employment or the final regular rate received by such employee, whichever is higher.

54. Section 207(5) provides that an employee who has accrued compensatory time off and requests the use of such compensatory time shall be permitted by the employer to use such time, after making the request, if the use of the compensatory time does not "unduly disrupt" the public agency's operation.

55. Notwithstanding the requirement of FLSA Section 207 (o) that employees are entitled to reclaim compensatory time at a rate of one and one-half times the number of hours for which overtime is required, the defendant only provides its employees with compensatory time that is equivalent to each hour of employment for which overtime compensation is taken.

56. Notwithstanding the requirement of Section 207(5) of the FLSA, employees in the defendant's Athletic Department who request the use of "comp time" are routinely denied regardless of whether or not it unduly disrupts the department's operation.

57. On information and belief, employees in UCONN'S Athletic Department are routinely required to work hours which far exceed the 35 hours that constitute a normal work week under Article 16.2 of the CBA.

58. As a result of the defendant's hostile and discriminating retaliation against Mr. Isenberg, any reasonable person in the plaintiff's position would have resigned.

59. The plaintiff was constructively discharged by the University of Connecticut.

60. The plaintiff has accrued approximately 1,750 hours of "comp time" which he has not been either able or permitted to use. Based on the provision of the FLSA governing compensation time, the plaintiff is entitled to approximately $81,500.00.

61. The University of Connecticut has willfully violated the FLSA with respect to its compensatory time policies and practices in its Athletic Department. As a result, the plaintiff is entitled to liquidated or double damages under the FLSA.

### THIRD COUNT – CMWA

62. Plaintiff repeats and realleges paragraphs 1-38 and 49-61.

63. Upon the termination of the plaintiff's employment on or about October 21, 2011 the University of Connecticut did not pay the plaintiff his accrued but unused compensatory time of approximately $81,500.00 and, therefore, violated the CMWA.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court:

(a) Award monetary damages for lost wages and benefits, plus liquidated damages in an equal amount and interest, as provided by the FLSA, 29 U.S.C. § 216(b), in an amount to be determined at trial;

(b) Award plaintiff monetary damages for lost wages and benefits and unpaid overtime, plus liquidated damages in an equal amount and interest, as provided by the FMLA in an amount to be determined at trial;

(c) Award plaintiff reinstatement and/or front pay, as provided by the FMLA;

(d) Award plaintiff compensatory damages as provided by the FMLA;

(e) Award plaintiff monetary damages and interest, as provided by the CMWA;

(f) Award attorneys' fees and costs to plaintiff for legal services pursuant to 29 U.S.C. § 216(b) and the ADEA; and

(g)  Grant such additional and further relief as the Court deems just and proper.

THE PLAINTIFF,
JASON ISENBERG

By: _____*[signature]*_____
Gary Phelan, Esq.
Fed. Bar No. ct03670
Cohen and Wolf, P.C.
320 Post Road West
Westport, CT 06880
Tel: (203) 222-1034
Fax: (203) 227-1373
Email: gphelan@cohenandwolf.com